## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FILE COPY

FRANK VANKY,

               Plaintiff,

    -against-

YU KWAI CHONG, CING WAN WONG, LIE XI
ZHUANG, LILY LEE CHEN, VICTOR A.
HOLLANDER, EILEEN B. BRODY, and JEFF
HAIYONG LIU,

               Defendants

    -and-

FUQI INTERNATIONAL, INC.

               Nominal Defendant

Case No. 4028

**NOTICE OF REMOVAL**



RECEIVED
MAY 14 2010
U.S.D.C. S.D. N.Y.
CASHIERS

Pursuant to 28 U.S.C. § 1441 *et seq.*, Nominal Defendant Fuqi International, Inc. ("Fuqi") hereby notices removal of this civil action from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York. This Court has removal jurisdiction because this is a civil action "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). In further support of this Notice of Removal, Fuqi alleges as follows:

    1.    On or about April 15, 2010, Plaintiff Frank Vanky ("Plaintiff") filed a civil action captioned Frank Vanky v. Yu Kwai Chong, Ching Wan Wong, Lie Xi Zhuang, Lily Lee Chen, Victor A. Hollander, Eileen B. Brody, Jeff Haiyong Liu, and Fuqi International, Inc., Index No.

600931/2010, in the Supreme Court of the State of New York, County of New York (the "State Court Action").

2.    Pursuant to 28 U.S.C. § 1446(a), attached as Exhibit A to this Notice of Removal is a true and correct copy of all pleadings, process and orders filed or delivered to Fuqi in the State Court Action.

3.    Pursuant to 28 U.S.C. § 1446(d), Fuqi is simultaneously filing a copy of this Notice of Removal with the Clerk of the Supreme Court of the State of New York, County of New York. Fuqi is also serving Plaintiff with a copy of this Notice of Removal.

4.    Plaintiff effected service of process on Fuqi's Registered Agent for the service of process on April 19, 2010. Thus, this Notice of Removal is timely under 28 U.S.C. § 1446(b).

5.    This Court has diversity jurisdiction over this civil action under 28 U.S.C. § 1332(a)(2), because the matter in controversy exceeds the value of $75,000 and is between citizens of a State and citizens or subjects of a foreign state.

    a)    Plaintiff Frank Vanky is, upon information and belief, a citizen and resident of Michigan. Plaintiff's address is presently unknown to Fuqi. (Complaint dated April 15, 2010 ("Compl.") ¶ 3).

    b)    Defendant Yu Kwai Chong ("Chong") is a citizen and resident of the People's Republic of China with an address at 4-6/F, 1 Block, Shihua Industrial Area, Cuizhu North Road, Luohu, Shenzhen, China.

2

Defendant Chong has not yet been served with process in the State Court Action.

c)      Defendant Ching Wan Wong ("Wong") is a citizen and resident of the People's Republic of China with an address at Unit E1, 13/F Kaiser Estate Phase 1, 41 Man Yue Street, Hunghom, Kowloon, Hong Kong. Defendant Wong has not yet been served with process in the State Court Action.

d)      Defendant Lie Xi Zhuang ("Zhuang") is a citizen and resident of the People's Republic of China with an address at 4-6/F, 1 Block, Shihua Industrial Area, Cuizhu North Road, Luohu, Shenzhen, China. Defendant Zhuang has not yet been served with process in the State Court Action.

e)      Defendant Lily Lee Chen ("Chen") is a citizen and resident of California with an address at 180 Aspen Oak Lane, Glendale, California 91207. Defendant Chen has not yet been served with process in the State Court Action.

f)      Defendant Victor A. Hollander ("Hollander") is a citizen and resident of California with an address at 9752 Alcott Street, Los Angeles, California 90035. Defendant Hollander has not yet been served with process in the State Court Action.

g)    Defendant Eileen B. Brody ("Brody") is a citizen and resident of Massachusetts with an address at 1 Pondview Circle, Natick, Massachusetts 01760. Defendant Brody has not yet been served with process in the State Court Action.

h)    Defendant Jeff Haiyong Liu ("Liu") is a citizen of the United States and is a domiciliary and resident of the People's Republic of China with an address at 1301, Block 3, No. 38 Building, Xingfu 2cun, Chaoyang District, Beijing 100027, China. Defendant Liu has not yet been served with process in the State Court Action.

i)    Nominal Defendant Fuqi is a Delaware corporation with its principal place of business at 5/F, Block 1, Shi Hua Industrial Zone, Cui Zhu Road North, Shenzhen, 518019, People's Republic of China.

j)    The State Court Action is a "derivative suit brought on behalf of Fuqi International, Inc., seeking to recover for damages caused to the Company by its directors and/or senior officers who [allegedly] breached their fiduciary obligations to the Company." (Compl., ¶ 1)

k)    The alleged breaches by the Individual Defendants of their fiduciary obligations arise out of allegedly false and misleading statements made by Fuqi that failed to disclose various adverse facts. (Compl. ¶ 47)

4

l)    Plaintiffs allege that as a result of the Individual Defendants' alleged misconduct Fuqi has "exposed itself to a barrage of private litigation, and enormous legal and other professional expenses in connection with possible regulatory investigations, as well as to costs related to the defense of these actions." (*Id.* at ¶ 51)

m)   Plaintiffs also allege that Fuqi's shareholders "have brought suit for violations of the federal securities laws as a result of the artificial inflation of the Company's stock by the Company's false and misleading announcements" and that Fuqi "is now subject to potential civil judgments totaling millions of dollars, in addition to the substantial legal and professional costs to be incurred in having to defend those actions." (*Id.* at ¶ 52)

n)    Plaintiff seeks to recover from the Individual Defendants "millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages." (*Id.* at ¶¶ 71, 75, 79, 82, 86, 89). Additionally, Plaintiff seeks contribution and indemnification from each of the Individual Defendants for any claims asserted against Fuqi arising out of the Individual Defendants' alleged misconduct. (*Id.* at ¶ 92)

o)    It is anticipated that Fuqi will incur significantly more than $75,000 in legal fees in defending against the private litigations and regulatory

investigations arising out of the allegedly false and misleading statements at issue in the State Court Action, and may potentially be subject more than $75,000 in potential civil judgments.   Accordingly, it is reasonably probable that the amount in controversy in the State Court Action exceeds $75,000.

6.      WHEREFORE, Fuqi notices removal of this case to the United States District Court for the Southern District of New York.

Dated:          New York, New York
                May 14, 2010

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: _____
        Kenneth A. Lapatine
        Adam Cole
        Toby Soli
        200 Park Avenue, 39th Floor
        New York, NY 10166
        Tel: (212) 801-9200
        Fax: (212) 644-2400

*Attorneys for Nominal Defendant*
*Fuqi International, Inc.*

Exhibit A

SCANNED ON 4/15/2010

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK

FRANK VANKY

Plaintiff(s),

-against-

[SEE ATTACHMENT]

Defendant(s).

Index No.

**Summons**

*10600931*

Date Index No. Purchased:

To the above named Defendant(s)

[SEE ATTACHMENT]

You are hereby summoned to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve
a notice of appearance, on the Plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

The basis of venue is   the transaction of business and/or the commission of tortious acts
which is   NEW YORK COUNTY

Dated:  April 15, 2010

**FILED**
APR 15 2010
COUNTY CLERK'S OFFICE
NEW YORK

SARRAF GENTILE LLP

by  _Ronen Sarraf_
Ronen Sarraf
**Attorneys for Plaintiff**
SARRAF GENTILE LLP
116 John Street, Suite 2310
New York, NY 10038
T: 212-868-3610
F: 212-918-7967
E: ronen@sarrafgentile.com

**Attachment**

Defendants:

YU KWAI CHONG
CHING WAN WONG
LIE XI ZHUANG
LILY LEE CHEN
VICTOR A. HOLLANDER
EILEEN B. BRODY
JEFF HAIYONG LIU


Nominal Defendant:

FUQI INTERNATIONAL, INC.

**SUPREME COURT OF THE STATE OF NEW YORK**
**NEW YORK COUNTY**

| | |
|---|---|
| FRANK VANKY,                      ) | |

FRANK VANKY,                          )

        Plaintiff,             )        Index No. _____   10600931

   vs.                                )

YU KWAI CHONG, CHING WAN WONG, LIE    )
XI ZHUANG, LILY LEE CHEN, VICTOR A.   )
HOLLANDER, EILEEN B. BRODY, and JEFF  )
HAIYONG LIU,                          )

      Defendants,            )

   -and-                             )

FUQI INTERNATIONAL, INC.              )

     Nominal Defendant.      )

**FILED**
APR 15 2010
COUNTY CLERK'S OFFICE
NEW YORK

## COMPLAINT

Plaintiff, by his undersigned attorneys, alleges upon personal knowledge as to himself and his acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Fuqi International, Inc. ("Fuqi" or the "Company"), seeking to recover for damages caused to the Company by its directors and/or senior officers who breached their fiduciary obligations to the Company. Named as Nominal Defendant is the Company and its directors and/or senior executive officers.

## JURISDICTION

2.      This action is within this Court's general subject-matter jurisdiction. Venue is proper in this County because Fuqi's stock trades on the The Nasdaq Stock Market ("Nasdaq")

1

Supreme Court Records OnLine Library - page 3 of 38

and a substantial portion of the transactions and wrongs complained of herein occurred in Manhattan.   Venue is also proper in this County because the Company has been charged with and is defending multiple class action lawsuits that were filed in Manhattan and which arise out of the same factual circumstances as alleged herein. *See, e.g., Mahapatra v. Fuqi International, Inc. et al.,* No. 1:10-cv-02515 (SDNY).

## PARTIES

3.     Plaintiff is and was a Company shareholder during the period in which the wrongful conduct alleged herein occurred through the present. Plaintiff resides in Washtenaw County, Michigan.

4.     Defendant Yu Kwai Chong ("Chong") is the principal founder of the Company and has served as President, Chief Executive Officer and Chairman of the Board of Directors (the "Board") since April 2001.  According to the Company, Chong has significant experience in the Chinese jewelry industry, having established the first gold jewelry manufacturing and sales company in Shenzhen over 20 years ago.  Chong is also the Permanent Director of the Gems & Jewelry Trade Association of China, Permanent Director of the Gems & Jewelry Trade Association of Guangdong and Associate President of Shenzhen Gold Jewelry Association.  Chong also currently serves as a director at a number of private companies that he owns in China, including Shenzhen Rongxing (Group) Limited, Shenzhen Xinke Investment Co., Ltd.

5.     Defendant Ching Wan Wong ("Wong") has served as the Chief Financing Officer and director of the Company since January 2004.  According to the Company, Wong has worked as a tax consultant at the Guandong Yuexin Registered Tax Agent Co., Ltd. from April 2002 to

2

the present. From September 2000 to March 2002, Wong served as the Finance Director of MindShare China, a communications firm. From 1995 to 2000, before serving MindShare, Mr. Wong served as Finance Director - China operation for Carat Media Representative (Asia) Limited, a multinational media company and Head of Finance - China for a foreign invested media company. Wong received his Bachelor of Business Administration from the Chinese University of Hong Kong and his Bachelor of Commerce from University of Southern Queensland. Wong is a Certified Practicing Accountant in Australia, Certificate Public Accountant in Hong Kong, and Certified General Accountant in Canada, and is experienced in international financial reporting and management.

6.      Defendant Lie Xi Zhuang ("Zhuang") is a co-founder of the Company and has served as Chief Operating Officer and director of the Company since April 2001. According to the Company, from 1997 to 2000, Zhuang served as the Business Manager of Shenzhen Ping Shen Gold and Silver Jewelry Co., Ltd., and from 1993 to 1997, Mr. Zhuang acted as the Business Manager of Shenzhen Gao De Gold and Silver Jewelry Company. Mr. Zhuang is certified with a Higher Diploma in Management by Hunan Xiang Tan University.

7.      Defendant Lily Lee Chen ("Chen") has served as a director of the Company since June 2007. According to the Company, Chen is presently Vice-Chair for the Asian-Pacific-USA Chamber of Commerce. Chen is a Commissioner for the California Commission on Aging. In 1982, Chen was elected to the Monterey Park City Council. In 1984, she became mayor of Monterey Park, California. Chen's public service includes positions in: the Advisory Committee on the rights Right and Responsibilities of Women, as appointed by President Ford; the National Advisory Council on Adult Education, as appointed by President Carter; California State World

3

Trade Commission as the appointed Assembly Speaker; Women in the Services (DACOWITS) as an Advisor appointed by Secretary of Defense Perry and the Board of Governor's of the East-West Center in Hawaii, as appointed by President Clinton and Secretary of State Albright. Chen earned her bachelor's degree in communications and a Master's in social work from the University of Washington, Seattle. Chen began her professional career in 1964, working for the Los Angeles County where she directed operations, program and grants management for numerous County programs. Her responsibilities included the management and supervision of a seventy million dollar budget and over four hundred employees.

8.      Defendant Victor A. Hollander ("Hollander") has served as a director of the Company since June 2007. According to the Company, Hollander has nearly 50 years of experience working with privately owned and public SEC reporting companies worldwide. Hollander has been involved in a substantial number of initial and secondary public offerings. In addition, he regularly assists companies with accounting issues relating to public and private offerings and reverse mergers, corporate reorganizations and acquisitions, and other fund raising and regulatory matters. Hollander began his public accounting career in 1954 at Joseph S. Herbert & Co. He has specialized in capital raises and merger and acquisition matters since 1962 when he started the firm Berger, Turner & Hollander. At this firm, he was the audit partner of the first Los Angeles ladies dress manufacturer to go public. In 1966, he joined Brout & Company and opened their offices in Los Angeles. During this time, he was the audit partner for many public companies listed on the New York Stock Exchange and the American Stock Exchange. In 1975, he joined an international public accounting firm, Lester Witte, as the firm's Senior Securities Partner. In 1978 he formed his own practice, Hollander, Gilbert & Company. It

4

was this practice that Mr. Hollander merged, as Managing Director of the West Coast Group, with Weinberg & Company. Mr. Hollander, after attending the University of Illinois, University of California at Los Angeles and after completing military service, graduated from Los Angeles State College with a Bachelor of Arts degree in Accounting. He has served on the Securities, Ethics and Accounting and Auditing Committees of various organizations, including the American Institute of Certified Public Accountants and California State Society of Certified Public Accountants. In addition, Hollander has served as a director, including as Chair of the audit committee, of several SEC reporting companies. He is currently serving as a director of China Direct (OTC.BB) and Micro Imaging Technology (OTC.BB).

9.      Director Eileen B. Brody ("Brody") has served as a director of the Company since June 2007. According to the Company, Brody is a CPA and has since August, 2005, been President of Dawson-Forte Cashmere, an apparel trading company that sources the majority of their cashmere products from China. From 1997 to 2004, she was the Vice President of Merchandising and Planning for Carter's Retail division of The William Carter Company. From 1992 to 1997, she held various management positions for Melville Corporation, a multi-billion dollar retailer. From 1983 to 1990, Brody worked for KPMG Peat Marwick in various positions, including as a Senior Manager. While at KPMG, she was responsible for audit services for a diverse clientele of large Fortune 500 companies as well as small publicly traded companies and provided due diligence services on a wide variety of acquisitions. She received her undergraduate and MBA degrees from Pace University and a second MBA from the Harvard Graduate School of Business. Brody is also a member of the board of directors of American Oriental Bioengineering Inc., a company listed on the New York Stock Exchange.

5

10.    Defendant Jeff Haiyong Liu ("Liu") has served as a director of the Company since June 2007. According to the Company, Liu is a U.S. citizen born in China, is General Manager of DBS (China) Investment Ltd., which is a wholly owned subsidiary of Singapore DBS Bank Group in China from December 2005 to the present. Prior to joining DBS, Mr. Liu served as a Vice President of SIG Group based in Shanghai from June 2000 to November 2005, where he focused on China Banking and trust and financial services opportunities. From January 1994 to September 1995, Mr. Liu worked in a Hong Kong based investment firm headquartered in Mainland China and was in charge of investment business for real estate and capital markets. In 1992, he served as Director of Securities Dept. of Shaanxi International Trust and Investment Corp. Ltd. and assisted in bringing the company's stock public in a $40 million public offering. Prior to 1992, Mr. Liu was Deputy Manager of International Banking Department of China Construction Bank, Shaanxi. Mr. Liu received an MBA from Indiana University at Bloomington, majoring in finance. He graduated from undergraduate school in 1985 in Xi'an, Shaanxi, majoring in finance.

11.    Defendants Chong and Wong are referred to herein as the "Officer Defendants."

12.    Defendants Chong, Wong, Zhuang, Chen, Hollander, Brody and Liu are referred to herein as the "Individual Defendants."

13.    Nominal Defendant Fuqi is a Delaware corporation and maintains its principal executive offices at 5/F., Block 1, Shi Hua Industrial Zone, Cui Zhu Road North, Shenzhen, 518019, People's Republic of China. Fuqi operates through its wholly-owned subsidiary, Fuqi International Holdings Co., Ltd., a British Virgin Islands corporation, and its wholly-owned subsidiary, Shenzhen Fuqi Jewelry Co., Ltd., a company established under the laws of China. In

6

November 2006, Fuqi consummated a reverse merger transaction and subsequently

reincorporated in Delaware on December 8, 2006. Fuqi describes itself as a leading designer,

producer and seller of high quality precious metal jewelry in China. The Company's registered

agent is Corporation Service Company, located at 2711 Centerville Road, Suite 400,

Wilmington, DE 19808.

14.     The Individual Defendants together with Fuqi are referred to herein as the

"Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

15.     By reason of their positions as officers and/or directors of the Company and

because of their ability to control the business and corporate affairs of the Company, the

Individual Defendants owed the Company and its shareholders the fiduciary obligations of good

faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control

and manage the Company in a fair, just, honest, and equitable manner. The Individual

Defendants were required to act in furtherance of the best interests of the Company and its

shareholders so as to benefit all shareholders equally and not in furtherance of their personal

interest or benefit. Each director and officer of the Company owes to the Company and its

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

affairs of the Company and in the use and preservation of its property and assets, and the highest

obligations of fair dealing.

16.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.

7

17.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

b.    when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence; and

c.    maintain and implement an adequate system of controls and information systems, such that no officer, director or employee of the Company would make false statements about Fuqi to the securities markets or would be able to misappropriate internal confidential information for his or her own benefit and profit, by insider stock trading or otherwise.

18.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors ("Board") meetings and committees thereof and via reports and other information provided to them in connection therewith.

19.    Each of the Individual Defendants, by virtue of their high-level positions with the

8

Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or deliberately disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements.

20.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Securities Exchange Act of 1934 and, during the relevant period, traded on the Nasdaq, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue.

21.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Fuqi, each of the Individual Defendants had access to the adverse undisclosed information about Fuqi's business prospects and financial condition and performance as particularized herein and knew (or

9

deliberately disregarded) that these adverse facts rendered the positive representations made by or about Fuqi and its business issued or adopted by the Company materially false and misleading.

22.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

23.    Fuqi is a designer, producer and seller of precious metal jewelry in China. The Company produces products made from gold, platinum and Karat gold (K-gold) and items that contain diamonds and other precious stones on a custom-order basis. Fuqi sells its products directly to distributors, retailers and wholesalers, who then sell its product to the ultimate consumer. As of March 31, 2009, the Company's wholesale distribution network included approximately 31 provincial distributors and more than 840 direct-sales distributors. Historically, no single customer has generated more than 10% of Fuqi's total net sales.

### Introduction

24.    On March 16, 2010, after the market closed, the Company announced that its financial statements for the first three quarters of 2009 had been materially misstated, that the Company would be required to restate its financial results for at least these periods and that the

10

Company would be unable to timely file its annual financial results for 2009. By it own admission, the Company Fuqi had materially overstated its gross profit and net income for these periods and had identified a "material weakness" in its financial controls. As a result, the Company stated that its previously-issued financial results could no longer be relied upon and that the filing of its annual financials would be delayed. The announcement caused a massive decline in the Company's stock price.

25.     The Company further announced it had identified deficiencies related to its 2009 Sarbanes-Oxley Section 404 compliance audit. According to the Company, these problems constitute a material weakness, including but not limited to the Company's period-end closing process of December 31, 2009. The connection with these finding, the Company identified accounting misstatements that are expected to have a material impact on its previously issued quarterly financial statements for the first three quarters of 2009. Although this internal review is underway, and the Company has not yet assessed their full impact, the Company announced that, as a result of these accounting deficiencies, the cost of sales for each of these periods was understated, and that gross profit and net income were overstated accordingly. The Company also announced that it would be required to delay the filing of its annual report on Form 10-K, including the disclosure of its annual consolidated financial statements, and stated that it would attempt to file these materials as soon as possible.

26.     On April 1, 2010, the Company announced that it received a notification letter dated April 1, 2010 from Nasdaq stating that the Company is no longer in compliance with Nasdaq Marketplace Rule 5250(c)(1), which requires timely filing of SEC periodic reports.

### The Company's False Statements

11

27.    On May 15, 2009 Fuqi issued a press release announcing its earnings for the

quarter ended March 31, 2009, which stated, in part:

Gross profit in the first quarter of 2009 increased 105% to $18.1 million from
$8.8 million for the same period in the prior year. Gross profit margin for the first
quarter of 2009 increased 510 basis points to 16.5% compared to 11.4% in the
same period in the prior year. The improvement in gross margin was primarily due
to an increase of product segments, benefit from gradually rising precious metal
prices and a stable increase in sales of Fuqi's and Temix's retail outlets. The
Company continues to prudently grow its retail business to capitalize on higher
retail margins, which has occurred in the first quarter of 2009.

. . . .

Income from operations for the first quarter increased 83% to $12.6 million from
$6.9 million in the first quarter of 2008. Net Income for the first quarter of 2009
increased 52% to $9.7 million, or $0.45 per diluted share, compared to $6.4
million, or $0.31 per diluted share in the same period of the prior year.

28.    Defendant Chong commented on the results, stating, in pertinent part:

We are excited to continue posting strong financial results in the first quarter of
2009, and are pleased to be one of the leaders in the growing luxury jewelry
market in China, which has been somewhat resistant to the effects of the
economic downturn. Despite the health of the global economy, we have put in
place a structure that has allowed us to continue growing at respectable rates. We
are now beginning to see signs of stability in the Chinese economy, which we
believe will bode even better for our future results. We are focusing our efforts to
drive the continued growth of our retail business and we believe the traditionally
larger margins will have an increasingly significant impact on our profitability as
our retail business continues to grow. We will continue to serve our wholesale
customers optimally, by maintaining the right amount of inventory and varieties of
design on hand at all time to fulfill our customer demand.

29.    In response to Defendants' positive statements, the price of Fuqi common stock

rose more than 17%, to close at $7.61 per share on May 18, 2009.  Also on May 15, 2009, Fuqi

filed with the SEC its Q1 2009 Form 10-Q, which was signed by the Officer Defendants.  As

noted above, the Q1 2009 Form 10-Q included Fuqi's financial statements for the quarter ended

12

March 31, 2009, which were represented to have been presented in conformity with U.S. GAAP.

In addition, the Q1 2009 Form 10-Q represented that:

  • In the opinion of the management, these condensed consolidated financial statements reflect all adjustments which are of a normal recurring nature and which are necessary to present fairly the financial position of Fuqi as of March 31, 2009 and the results of operations and the cash flows for the three-month periods ended March 31, 2009 and 2008.

  • Inventories are stated at the lower of cost or market. The first-in-first-out method is used to account for gold and platinum jewelries and the specific identification method for diamond jewelries.

  • The Company enters into certain gold futures contracts with its supplier, Shanghai Gold Exchange. Gold futures offered by Shanghai Gold Exchange are designed for full members to hedge or to acquire inventory at a preset price. The futures contract arrangements include purchase call and/or put options. The Company utilized these futures contracts to manage its consolidated exposure to changes in inventory values due to fluctuations in market prices and is not considered as hedges under SFAS 133. The Company's gold futures positions are marked to market at each reporting date and all unrealized gains and losses are recognized in earnings. A gain on derivatives of approximately $78,000 and $841,000 was recognized as non-operating income in the consolidated statement of income for the three months ended March 31, 2009 and 2008, respectively.

  • Cost of sales is mainly comprised of costs of raw materials, primarily gold, platinum and diamonds, in addition to direct manufacturing costs, factory overhead and processing fees. Cost of sales for the three months ended March 31, 2009 increased to $91.3 million, an increase of $22.5 million, or 32.7%, from $68.8 million for the same period in 2008.

  • Wholesale and distribution cost of sales increased by $14.9 million, or 22%, in the first quarter of 2009 to $82.7 million from $67.8 million for the first quarter of 2008. The increase in cost of sales, which was consistent with the increase in net sales, was primarily due to an increase in the cost of raw materials, which resulted from the increase in both sales volume and the general increase in direct labor.

  • Cost of retail sales for the three months ended March 31, 2009 increased by $7.7 million to 8.7 million from approximately $0.95 million for the same period in 2008. The increase in cost of retail sales for the three months ended March 31, 2009 was primarily due to the increase in sales volume.

  • Gross profit for the three months ended March 31, 2009 increased to $18.1

13

Supreme Court Records OnLine Library - page 15 of 38

million, an increase of $9.3 million, or 106%, from $8.8 million for the comparable period in 2008. Gross profit margin increased to 16.5% for the three months ended March 31, 2009, compared to 11.4% for the same period in 2008. The increase in profit margin was mainly attributable to an increase of product segments, an expansion in retail sales, which resulted from an increase in brand awareness and an opening additional jewelry counters in locations and acquisition of Temix's 50 retail stores in 2008.

30.    The Q1 2009 Form 10-Q also included the following representations about the

Company's disclosure and internal controls and the Individual Defendants certifications thereon:

Disclosure controls and procedures refer to controls and other procedures designed to ensure that information required to be disclosed in the reports we file or submit under the Securities Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. As required by Rule 13a-15(b) under the Securities Exchange Act, our management has carried out an evaluation, with the participation and under the supervision of our Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of March 31, 2009. As discussed in more detail below, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were ineffective as of March 31, 2009, due to the material weaknesses that we identified in internal control over financial reporting, specifically related to period-end closing process and revenue recognition in improper periods.

1.    *We did not maintain effective control over the period-end closing process*. Due to the insufficient number of qualified resources, we were unable to timely and accurately complete our work needed to close our books and prepare financial statements in accordance with accounting principles generally accepted in the United States of America for period covered by this report. In addition, this control deficiency could result in a material misstatement to annual or interim financial statements that would not be prevented or detected.

2.    *We did not maintain effective control over the revenue cycle with revenue recognition*. We did not properly perform and follow the control procedures set forth in the revenue cycle. This control deficiency resulted in significant amounts of sales not being recorded in the proper periods.

**Remediation Measures of Material Weaknesses**

14

We have implemented the following measures in 2009 as indicated:

1.      We have increased efforts to enforce internal control procedures. We have started restructuring our China financial department and clarifying the responsibilities of key personnel in order to increase communications and accountability. Under the new procedures, non-routine transactions are identified and presented to senior financial management when discovered to ensure proper accounting treatment. We will seek opportunities to provide additional technical resources in order to improve the quality of the reviews of underlying financial information related to certain significant transactions. We will continue to review and assess the effectiveness of the restructuring and make modifications accordingly in an effort to improve the effectiveness of our control procedures.

2.      We have hired and will continue to hire additional qualified financial personnel for the accounting department to further strengthen our China financial reporting function. In 2009, we hired 4 additional personnel in our accounting and finance department.

3.      We will continue to evaluate our existing staff and make modifications as necessary, in addition to providing additional training on accounting principles and internal control procedures for our existing staff. We have also required all personnel in our China financial department to obtain additional accounting certifications.

4.      We continually review and improve our standardization of our monthly and quarterly data collection, analysis, and reconciliation procedures. To further improve the timeliness of data collection, we are selecting and will install new point of sale systems and enterprise resource planning systems for our wholesale and retail operations. We have also implemented a variety of manual review procedures, such as an extensive review of journal entry postings into the accounting system, a thorough review of account reconciliation, and a detailed review by our U.S. reporting team of the trial balance from our China entity, to ensure the completeness and accuracy of the underlying financial information.

5.      We have increased the level of communication and interaction among sales department, production department, PRC accounting team and other external advisors. In addition, our Chief Financial Officer and US GAAP team are becoming increasingly involved with the financial accounting and reporting process in China and are monitoring such processes. For example, we will relocate a portion of the US GAAP team from our Hong Kong office to our Shenzhen offices to strengthen the local accounting and reporting processes.

6.      We are in the process of expanding the internal control functions and honing related policies and procedures. As referenced above, we hired a qualified

15

and experienced Internal Audit Manager, who commenced work in January 2009. We also plan to allocate and transfer additional resources to the internal audit department for the purpose of enhancing the internal audit function.

**Changes in Internal Controls over Financial Reporting**

Due to the implementation of the remedial measures described above, in addition to the designing, planning, and integration of the internal controls over financial reporting for Temix, there were changes in our internal controls over financial reporting during the first quarter of fiscal 2009 that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

> . . . .

I [Defendants Chong and Wong], certify that:

1.      I have reviewed this report on Form 10-Q of Fuqi International, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        a.      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b.      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial

16

reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      c.     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      d.     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

31.     The representations about the Company's disclosure and internal controls, and the

Officer Defendants certifications thereon, were repeated in all material respects in the Forms 10-

Q that Fuqi filed with the SEC throughout the remainder of the relevant period.

32.     On August 6, 2009, Fuqi issued a press release announcing its earnings for the

quarter ended June 30, 2009, which stated, in part:

Gross profit in the second quarter of 2009 increased 145.1% to $17.4 million from $7.1 million for the same period in the prior year. Gross profit margin for the second quarter of 2009 increased 660 basis points to 17.2% compared to 10.6% in the same period in the prior year. The improvement in gross margin was primarily due to an increase of product segments, an expansion in retail sales, which resulted from an increase in brand awareness, and opening additional jewelry

17

counters as well as our acquisition of Temix's 50 retail counters/stores in 2008. Second quarter wholesale gross margin increased 510 basis points to 15.7% compared to 10.6% in the prior year period while retail gross margin increased significantly to 33.7% in the second quarter of 2009 compared to 7.4% in the second quarter of the prior year.

. . . .

Income from operations for the second quarter increased 120% to $13.2 million from $6.0 million in the second quarter of 2008. Net income for the second quarter of 2009 increased 86.8% to $9.9 million, or $0.45 per diluted share, compared to $5.3 million, or $0.25 per diluted share in the same period of the prior year.

33.    Defendant Chong commented on the results, stating, in pertinent part:

I am pleased to report that, our team has once again delivered strong second quarter results. We believe this is an indication that our wholesale and retail strategy, combined with our vertically integrated operations and growing brand recognition, provides us with a blueprint for success and reflects the strength of our position in the growing Chinese jewelry marketplace. We look forward to capitalizing on opportunities that present themselves and putting the capital from our recently closed $120 million public offering in accretive use in the near future. We are excited about our opportunities to continue growing both our wholesale and retail businesses as well as focusing on our long-term goals. We continue to explore opportunities to enhance our growth and which will enable us to become a more efficient and productive organization so that we can continue to deliver solid results for our shareholders.

34.    In response to Defendants' positive statements, the price of Fuqi common stock rose more than 12%, to close at $27.39 per share on August 6, 2009.

35.    On or about July 21, 2009, Fuqi filed with the SEC a Form S-3/A registration statement (the "First Registration Statement") for the August 2009 Offering. The First Registration Statement offered to sell an indeterminate number of shares of common stock, preferred stock, warrants to purchase common stock or preferred stock, and debt securities with an aggregate initial offering price not to exceed $100,000,000.

18

36.    On or about July 21, 2009, the First Registration Statement was declared effective by the SEC.

37.    On or about July 30, 2009, Fuqi filed, pursuant to Rule 462(b) promulgated under the Securities Act, a Form S-3 registration statement (the "Second Registration Statement") with the SEC to register an additional amount of common stock having a proposed maximum aggregate offering price of $20,000,000. The Second Registration Statement incorporated, in its entirety, the First Registration Statement by reference. The First Registration Statement and Second Registration Statement are collectively referred to herein as the "Registration Statements."

38.    On or about July 31, 2009 Fuqi filed with the SEC a prospectus supplement, which formed part of the Registration Statements (the "Prospectus"), offering 4,855,000 common shares to the public at $21.50 per common share. Fuqi also granted the Underwriter Defendants an option to purchase up to an additional 726,395 common shares at $21.50 per share. Fuqi raised approximately $113 million through the sale of stock in the August 2009 Offering.

39.    On August 6, 2009, Fuqi filed with the SEC its Form 10-Q for the quarter ended June 30, 2009 (the "Q2 2009 Form 10-Q"), which was signed by the Officer Defendants. The Q2 2009 Form 10-Q included Fuqi's financial statements for the quarter ended June 30, 2009, which were represented to have been presented in conformity with U.S. GAAP. In addition, the Q2 2009 Form 10-Q represented that:

> • In the opinion of the management, these condensed consolidated financial statements reflect all adjustments which are of a normal recurring nature and which are necessary to present fairly the financial position of Fuqi as of June 30, 2009 and the results of operations for the three and six months ended June 30, 2009 and 2008, and the cash flows for the six months ended June 30, 2009 and 2008.

19

• Inventories are stated at the lower of cost or market. The first-in-first-out method is used to account for gold and platinum jewelries and the specific identification method for diamond jewelries.

• The Company enters into certain gold futures contracts with its supplier, Shanghai Gold Exchange. Gold futures offered by Shanghai Gold Exchange are designed for full members to hedge or to acquire inventory at a preset price. The futures contract arrangements include purchase call and/or put options. The Company utilized these futures contracts to manage its consolidated exposure to changes in inventory values due to fluctuations in market prices and is not considered as hedges under SFAS 133.

• Effective January 1, 2009, the Company adopted the disclosure requirements of SFAS No. 161, Disclosures about Derivative Instruments and Hedging Activities—an Amendment of FASB Statement No. 133 (SFAS 161). As of June 30, 2009 and December 31, 2008, the Company's only derivative instrument was the gold future contracts which were shown as gold future contracts under assets in the accompanying condensed consolidated balance sheets. The fair value of these old future contracts totaled $73,762 and $1,426,236, as of June 30, 2009 and December 31, 2008, respectively.

• A gain from the derivative instrument of approximately $17,000 and $721,000 for the three months ended June 30, 2009 and 2008, respectively, and $96,000 and $1,561,000 for the six months ended June 30, 2009 and 2008, respectively, was recognized as gain from derivative instrument under other income (expense) in the accompanying condensed consolidated statements of income.

• Cost of sales is mainly comprised of costs of raw materials, primarily gold, platinum and diamonds, in addition to direct manufacturing costs, factory overhead and processing fees. Cost of sales for the three months ended June 30, 2009 increased to $83.5 million, an increase of $23.7 million, or 39.7%, from $59.8 million for the same period in 2008.

• Wholesale and distribution cost of sales increased by $18.9 million, or 31.9%, in the second quarter of 2009 to $78.0 million from $59.1 million for the second quarter of 2008. The increase in cost of sales, which was consistent with the increase in net sales, was primarily due to an increase in the cost of raw materials, which resulted from the increase in both sales volume and the general increase in direct labor.

• Cost of retail sales for the three months ended June 30, 2009 increased by $4.8 million to $5.5 million from approximately $691,000 for the same period in 2008. The increase in cost of retail sales for the three months ended June 30, 2009 was primarily due to the increase in sales volume.

• Gross profit for the three months ended June 30, 2009 increased to $17.4 million, an increase of $10.3 million, or 145%, from $7.1 million for the comparable period in 2008. Gross profit margin increased to 17.2% for the three months ended June 30, 2009,

20

compared to 10.6% for the same period in 2008. The increase in profit margin was mainly attributable to an increase of product segments and an expansion in retail sales, which resulted from an increase in brand awareness, an opening of additional jewelry counters, and acquisition of Temix's 50 retail stores in August 2008.

• Cost of sales for the six months ended June 30, 2009 increased to $174.8 million, an increase of $46.3 million, or 36.0%, from $128.5 million for the same period in 2008.

• Wholesale and distribution cost of sales increased by $33.7 million, or 26.6%, in the first six months of 2009 to $160.6 million from $126.9 million for the first six months of 2008. The increase in cost of sales, which was consistent with the increase in net sales, was primarily due to an increase in the cost of raw materials, which resulted from the increase in both sales volume and the general increase in direct labor.

• Cost of retail sales for the six months ended June 30, 2009 increased by $12.6 million to $14.2 million from approximately $1.6 million for the same period in 2008. The increase in cost of retail sales for the six months ended June 30, 2009 was primarily due to the increase in sales volume.

• Gross profit for the six months ended June 30, 2009 increased to $35.4 million, an increase of $19.5 million, or 123%, from $15.9 million for the comparable period in 2008. Gross profit margin increased to 16.8% for the six months ended June 30, 2009, compared to 11.0% for the same period in 2008. The increase in profit margin was mainly attributable to an increase of product segments and an expansion in retail sales, which resulted from an increase in brand awareness, an opening of additional jewelry counters, and acquisition of Temix's 50 retail stores in August 2008.

40.    On November 9, 2009, Fuqi issued a press release announcing its earnings for the

quarter ended September 30, 2009, which stated, in part:

Gross profit in the third quarter of 2009 increased 172.0% to $29.9 million from $11.0 million for the same period in the prior year. Gross profit margin for the third quarter of 2009 increased to 23.5% compared to 11.7% in the same period in the prior year. The improvement in gross margin was primarily due to higher wholesale margins resulting from several sizeable ODM orders fulfilled during the third quarter. Third quarter wholesale gross margin increased 12.8% to 23.6% compared to 10.8% in the prior year period while retail gross margin was 22.6% in the third quarter of 2009 compared to 38.0% in the third quarter of the prior year.

    . . . .

Income from operations for the third quarter increased 192.3% to $24.2 million from $8.3 million in the third quarter of 2008. Net income for the third quarter of 2009 increased

21

187.9% to $18.8 million, or $0.73 per diluted share, compared to $6.5 million, or $0.31 per diluted share in the same period of the prior year.

41.    Defendant Chong commented on the results, stating, in pertinent part:

I am pleased to report that, our team has once again delivered strong third quarter results, especially as the third quarter has historically been a seasonally slower quarter for FUQI. During the third quarter, we were able to report stronger than expected wholesale results primarily due to increased sales volume and through our original design manufacturing (ODM) work. As our brand grows throughout China, we plan to continue to capitalize on such opportunities to enhance our wholesale and retail businesses. Furthermore, we will continue with our collaborative relationship with several well-known universities specialized in gemological training in China to further enhance our product and designs as well as to develop innovative technological products. We remain confident with our fully integrated wholesale and retail platforms, and we believe that we are well on our way to becoming one of the dominant jewelry enterprises in China.

42.    Also on November 9, 2009, Fuqi filed with the SEC its Form 10-Q for the quarter

ended September 30, 2009 (the "Q3 2009 Form 10-Q"), which was signed by the Officer

Defendants. The Q3 2009 Form 10-Q included Fuqi's financial statements for the quarter ended

September 30, 2009, which were represented to have been presented in conformity with U.S.

GAAP.

43.    In addition, the Q3 2009 Form 10-Q represented that:

• In the opinion of the management, these condensed consolidated financial statements reflect all adjustments which are of a normal recurring nature and which are necessary to present fairly the financial position of Fuqi as of September 30, 2009 and the results of operations for the three and nine months ended September 30, 2009 and 2008, and the cash flows for the nine months ended September 30, 2009 and 2008.

• Inventories are stated at the lower of cost or market. The first-in-first-out method is used to account for gold and platinum jewelries and the specific identification method for diamond jewelries.

• The Company enters into certain gold futures contracts with its supplier, Shanghai
Gold Exchange. Gold futures offered by Shanghai Gold Exchange are designed for full members to hedge or to acquire inventory at a preset price. The futures

22

contract arrangements include purchase call and/or put options. The Company utilized these futures contracts to manage its consolidated exposure to changes in inventory values due to fluctuations in market prices and is not considered as hedges under US GAAP.

• Effective January 1, 2009, the Company adopted the disclosure requirements of FASB regarding disclosures about derivative instruments and hedging activities. As of December 31, 2008, the Company's only derivative instrument was the gold future contracts which were shown as gold future contracts under assets in the accompanying condensed consolidated balance sheets. The fair value of these gold future contracts totaled $0 and $1,426,236, as of September 30, 2009 and December 31, 2008, respectively.

• The Company incurred a loss from the derivative instrument of approximately $19,000 for the three months ended September 30, 2009 and recognized a gain from the derivative instrument of approximately $23,000 for the three months ended September 30, 2008. In addition, a gain of approximately $77,000 and $1,584,000 for the nine months ended September 30, 2009 and 2008, respectively, was recognized as gain from derivative instrument under other income (expense) in the accompanying condensed consolidated statements of income.

• Cost of sales is mainly comprised of costs of raw materials, primarily gold, platinum and diamonds, in addition to direct manufacturing costs, factory overhead and processing fees. Cost of sales for the three months ended September 30, 2009 increased to $97.3 million, an increase of $14.6 million, or 17.7%, from $82.7 million for the same period in 2008.

• Wholesale and distribution cost of sales increased by $9.0 million, or 11.2%, in the third quarter of 2009 to $89.7 million, as compared to $80.7 million for the third quarter of 2008. The increase in the dollar amount of cost of sales was primarily due to an increase in the cost of raw materials, which resulted from the increase in both sales volume and the general increase in direct labor. As a percentage of net sales, the cost of sales increased at a slower rate than the increase in net sales primarily because of the higher contribution of ODM revenue.

• Cost of retail sales for the three months ended September 30, 2009 increased by $5.5 million to $7.5 million, as compared to approximately $2.0 for the same period in 2008. The increase in the dollar amount of cost of retail sales for the three months ended September 30, 2009 was primarily due to the increase in sales volume.

• Gross profit for the three months ended September 30, 2009 increased to $29.9 million, an increase of $18.9 million, or 172%, from $11.0 million for the

23

comparable period in 2008. Gross profit margin increased to 23.5% for the three months ended September 30, 2009, compared to 11.7% for the same period in 2008. The increase in profit margin was mainly attributable to an opening of additional jewelry counters and shops and an increase of product segments. In addition, the launch of the hard gold series that attracted an increasing volume of subcontracting contracts contributed to 13.5% increase in the gross profit margin during the third quarter.

• Cost of sales for the nine months ended September 30, 2009 increased to $272.0 million, an increase of $60.8 million, or 28.8%, from $211.2 million for the same period in 2008.

• Wholesale and distribution cost of sales increased by $42.7 million, or 20.6%, in the first nine months of 2009 to $250.3 million, as compared to $207.6 million for the first nine months of 2008. The increase in dollar amount of cost of sales was primarily due to an increase in the cost of raw materials, which resulted from the increase in both sales volume and the general increase in direct labor. As a percentage of net sales, the cost of sales increased at a slower rate than the increase in net sales primarily because of the increase in ODM revenue.

• Cost of retail sales for the nine months ended September 30, 2009 increased by $18.1 million to $21.7 million, as compared to approximately $3.6 for the same period in 2008. The increase in the dollar amount of cost of retail sales for the nine months ended September 30, 2009 was primarily due to the increase in sales volume.

• Gross profit for the nine months ended September 30, 2009 increased to $65.3 million, an increase of $38.4 million, or 143%, from $26.9 million for the comparable period in 2008. Gross profit margin increased to 19.4% for the nine months ended September 30, 2009, compared to 11.3% for the same period in 2008. The increase in profit margin was mainly attributable to an increase of product segments and an expansion in retail sales, which resulted from an increase in brand awareness, an opening of additional jewelry counters and shops.

## The Truth Is Revealed

44.     On March 16, 2010, Fuqi issued a press release announcing its preliminary

financial results for the fourth quarter ended December 31, 2009 and the delay in filing its

Annual Report on Form 10-K.  With regard to the Company's financial results, the release stated,

in part:

24

The Company anticipates total revenue for the 2009 fourth quarter to be approximately $175-$180 million, compared to its original fourth quarter 2009 forecast of $182.0-$191.0 million. Consolidated gross margin is expected to be in the 9%-10% range and diluted earnings per share is expected to be in the range of $0.24 to $0.28 per share compared to original diluted per share estimates of $0.55-$0.60.

45.    Also on March 16, 2010, Fuqi filed a Form 8-K with the SEC that, in part,

disclosed:

**Non-Reliance on Previously Issued Financial Statement or a Related Audit Report or Completed Interim Review.**

On March 11, 2010, the management and the Audit Committee of the Company concluded that the Company's previously issued financial statements:

(i) as of and for the three months ended March 31, 2009 as included in the Company's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission (the "Commission") on May 15, 2009 (the "First Quarter 10- Q"),

(ii) as of and for the three and six months ended June 30, 2009 as included in the Company's Quarterly Report on Form 10-Q filed with the Commission on August 6, 2009 (the "Second Quarter 10-Q"), and

(iii) as of and for the three and nine months ended September 30, 2009 as included in the Company's Quarterly Report on Form 10-Q filed with the Commission on November 9, 2009 (the "Third Quarter 10-Q", and collectively with the First Quarter 10-Q and the Second Quarter 10-Q, the "Filings"), should not be relied upon due to an error in the accounting of inventory and cost of sales.

The Company has been conducting an assessment of its internal controls as of December 31, 2009 in accordance with the Company's Sarbanes-Oxley Act compliance procedures. Although the Company's assessment procedures are not yet complete, the Company believes that at least one of the identified deficiencies related to its 2009 Sarbanes-Oxley Section 404 compliance audit, thus far, constitutes a material weakness, including but not limited to the Company's period-end closing process as of December 31, 2009. As a result of the findings of the 2009 Sarbanes-Oxley Section 404 audit, thus far, the Company identified certain errors related to the accounting of the Company's inventory and cost of sales.

The result of the accounting errors are expected to have a material impact on the

25

previously issued quarterly financial statements for the first three quarters of 2009, as contained in the Filings. Management and the accounting personnel require additional time to conduct an internal evaluation of such effects on the previously filed quarterly financial statements of 2009. Because the review is still underway, the Company is unable to accurately estimate at this time the impacts on the Company's interim financial statements for the first three quarters of 2009.

However, based on the current status of the Company's evaluation, it is expected that the result of the accounting errors is that the cost of sales for each of the first and second quarters of 2009 were understated and gross profit and net income, as a result, were accordingly overstated in such periods. Based on the Company's latest estimate, the possible overstatement is currently anticipated to be approximately 12%-14% and 21%-23% for the first quarter and the second quarter of 2009, respectively, and the earnings per share included in the previously issued financial statements for the nine months ended September 30, 2009 were overstated by approximately $0.15-$0.19 per share based on approximately 23.0 million weighted average number of shares for the nine months ended September 30, 2009. The foregoing estimates are based only upon preliminary information available to the Company as of the date of this Form 8-K, are subject to adjustments in connection with its ongoing review, and have not been audited by the Company's independent registered public accounting firm.

As a result of the foregoing, the Company's completion of its annual consolidated financial statements and required disclosure is being delayed pending the Company's completion of analysis and evaluation of the potential errors on the previously issued quarterly financial statements for 2009.

46.     In response to these statements shares of the Company's stock fell more than 37%, to close the next day at $11.90 per share, on approximately 20 times its normal trading volume.

47.     As a result of the foregoing, the Individual Defendants made and caused the Company to make statements that were materially false and misleading when they were made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or disregarded by them:

(a)     that the Company's financial results were artificially inflated due to Fuqi's

26

material misstatement of its inventory and cost of sales;

(b)    that the Company's internal and disclosure controls with respect to its inventory and cost of sales were materially deficient;

(c)    that the Company's financial statements were materially false, misleading and not fairly presented in conformity with GAAP; and

(d)    that Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and growth.

48.    As a result of the Defendants' wrongdoing, the Company and its senior officers and directors have been named as defendants in class action lawsuits alleging violations, among others, of the anti-fraud provisions of the federal securities laws. *See, e.g., Mahapatra v. Fuqi International, Inc. et al.*, No. 1:10-cv-02515 (SDNY).

## DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

49.    As fiduciaries of the Company and by reason of their ability to control the business and corporate affairs of Fuqi, the Individual Defendants owed the Company obligations of fidelity, trust, loyalty and care, were required to use their utmost ability to control and manage the Company's affairs in a fair, just, honest and equitable manner, and were required to act in furtherance of the best interests of the Company and its shareholders and not in their own personal interest and benefit.

50.    As senior officers and/or directors of the Company, the Individual Defendants owed duties to the Company to conduct its affairs in good faith, in furtherance of the best interest of the Company and its shareholders and within the bounds of the law.

51.    In contravention of those duties and obligations, the Individual Defendants caused Fuqi to engage in unlawful conduct which has severely harmed the Company. The Company has

27

exposed itself to a barrage of private litigation, and enormous legal and other professional expenses in connection with possible regulatory investigations, as well as to costs related to the defense of these actions.

52.    The Company's shareholders have brought suit for violations of the federal securities laws as a result of the artificial inflation of the Company's stock by the Company's false and misleading announcements. The Company is now subject to potential civil judgments totaling millions of dollars, in addition to the substantial legal and professional costs to be incurred in having to defend those actions.

53.    The Company's reputation has been severely damaged.

### DEMAND WOULD BE FUTILE

54.    Plaintiff brings this action derivatively in the right and for the benefit of Fuqi to redress injuries suffered and to be suffered by Fuqi as a result of the breaches of fiduciary duty by the Individual Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

55.    Plaintiff will adequately and fairly represent the interests of Fuqi and its shareholders in enforcing and prosecuting its rights.

56.    Plaintiff is a holder of Fuqi common stock and was a holder of such stock during the period in which the Defendants' wrongful course of conduct alleged herein was occurring through the present.

57.    As a result of the facts set forth herein, Plaintiff has not made a demand upon the Company's Board of Directors (the "Board") to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because a majority of the Board is

28

incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

58.    The Board, which currently exists of the seven Individual Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties by actively participating or acquiescing in the wrongdoing alleged herein and/or by failing to implement adequate controls and procedures necessary to reasonably assure that the wrongdoing alleged herein did not occur. Such failures could not have been an exercise of good faith business judgment.

59.    The Board participated in the drafting, preparation, and/or approval of the various public communications complained of herein, and were aware of, and/or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Fuqi, each of the members of the Board had access to the undisclosed information about Fuqi's business prospects and as particularized herein knew (or recklessly disregarded) that the positive representations made by or about Fuqi, its business and its business prospects were materially false and misleading.

60.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the Company's statements during the relevant period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after its issuance and/or had the ability and/or opportunity to prevent its issuance or cause it to be corrected. Accordingly, each of the Individual Defendants was responsible for the accuracy of the press release and the representations contained therein.

29

61.    The Board had a responsibility and obligation to assure that all press releases and filings of SEC reports were truthful and not materially misleading and that proper controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are described in this complaint but failed to do so.

62.    The members of the Board have not only been complacent in acting on behalf of the Company, but were necessary actors in the improper conduct alleged herein, and have actively condoned and facilitated a campaign of deceit upon the shareholders of the Company through the Company's filings with the SEC, communications with the public, and the sale of Company securities. The Board approved option compensation, approved officers' incentive compensation, and received their own stock options as compensation, thereby personally benefitting from the improper conduct alleged herein. Moreover, they promoted the continuation of the scheme to further their personal interests as directors of the Company and as a result of their loyalty to the Individual Defendants. Accordingly, the members of the Board cannot possibly be expected to act independently in charging themselves with wrongdoing.

63.    All of the Individual Defendants face a substantial likelihood of liability in this action because of their failure, as directors and/or officers, to assure that a reliable system of financial controls was in place and functioning effectively. The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire Board faces substantial exposure to liability. These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for the Company.

30

64.    The substantial likelihood of liability which the Individual Defendants face are for non-exculpated breaches of fiduciary duty. Among these non-exculpated breaches are the Individual Defendants' abdication of their responsibility to implement adequate disclosure controls concerning the Company's financial information.

65.    The substantial likelihood of liability faced by the Individual Defendants is particularly strong against the three members of the Board's Audit Committee: Brody, Hollander, and Liu (two of whom are certified public accountants). That is so because of their obligation to directly oversee the Company's accounting and financial reporting. As admitted by the Company, the Board and, in particular, the members of the Audit Committee, failed to oversee and put into place the proper controls, procedures and protocols necessary to ensure that all financial statements issued by the Company are accurate and in accordance with GAAP. Defendants Brody, Hollander and Liu thus abdicated their fiduciary obligations to the Company and actively participated in the wrongdoing complained of herein.

66.    Fuqi has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not filed any lawsuits against themselves or others who were responsible for such wrongful conduct that caused the filing of securities class actions against the Company.

67.    If the Board was to bring this derivative action against themselves, they would expose their own recklessness and misconduct which underlies the allegations against the Company contained in the class action complaints for violations of the federal securities laws which have been brought against the Company and many of the Individual Defendants. Such admissions would impair the Company's defense of the class actions and greatly increase the probability of their

31

personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Defendants.

## COUNT ONE
### Breach of Fiduciary Duty
### (Against All Defendants)

68.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

69.    Defendants had and have fiduciary duties of loyalty and care to ensure that the Company adopts and follows a competent, effective and honest business plan. This plan is to ensure, among other things, compliance with contracts, various state and federal regulations regarding proper business practices, and state and federal laws, including the abdication of their responsibility to implement adequate disclosure controls concerning the Company's financial information.

70.    Defendants breached their fiduciary duties of loyalty and care by intentionally or recklessly approving, and/or deliberately and knowingly being indifferent to announcements regarding the Company's business.

71.    As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT TWO
### Gross Negligence
### (Against All Defendants)

72.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

73.    Defendants had and have fiduciary duties of loyalty and care to ensure that the Company adopts and follows a competent, effective and honest business plan. This plan is to ensure, among other things, compliance with contracts, various state and federal regulations regarding proper

32

business practices, and state and federal laws.

74.     The Defendants breached their fiduciary obligations by allowing and/or being indifferent to announcements regarding the Company's business. The Defendants acted with gross negligence, recklessness and/or bad faith in breaching these fiduciary duties.

75.     As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

### COUNT THREE
### Abuse of Control
### (Against All Defendants)

76.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

77.     Defendants had and have the ability to control and influence Fuqi to act in the best interest of its shareholders, and to adopt and follow a competent, effective and legal business plan. This plan is to ensure, among other things, compliance with contracts, various state and federal regulations regarding proper business practices, and state and federal laws.

78.     The Defendants misconduct alleged herein constituted an abuse of their ability to control and influence Fuqi, for which they are legally responsible.

79.     As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

### COUNT FOUR
### Gross Mismanagement
### (Against All Defendants)

80.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

33

81.    The Defendants, by their misconduct, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Fuqi in a manner consistent with the operations of a publicly held corporation.

82.    As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT FIVE
### Breach of Contract
### (Against all Defendants)

83.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

84.    Defendants, as officers and/or directors of Fuqi, contracted with Fuqi, in exchange for substantial compensation and professional prestige, to act in the best interest of Fuqi and to cause Fuqi to operate lawfully.

85.    Defendants, by the actions and omissions detailed herein, breached their contractual obligations and commitments to Fuqi to act in the best interest of Fuqi.

86.    As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

87.    Defendants, as officers and/or directors of Fuqi, are liable to the Company for wasting these corporate assets.

## COUNT SIX
### Waste of Corporate Assets
### (Against all Defendants)

34

88.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

89.     As a result of the improper policies established and executed during the relevant period, and by failing to conduct proper supervision, Defendants have caused Fuqi to waste valuable corporate assets by improper transactions, payments of incentive awards to certain executive officers and incurring potentially millions of dollars worth of legal liability and/or legal costs to defend certain misconduct.

### COUNT SEVEN
**Contribution and Indemnification**
**(Against all Defendants)**

90.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

91.     Fuqi is alleged to be liable to various persons and/or entities by virtue of the same facts or circumstances as are alleged to give rise to Defendants' liability to Fuqi.  As a result of Defendants' conduct, Fuqi is exposed to the potential payment of substantial penalties in connection with any governmental investigations and liability arising from civil judgments.

92.     Fuqi's alleged liability on account of the acts alleged herein arises in whole or in part from the intentional, reckless, disloyal and bad faith acts or omissions of Defendants as alleged above, and Fuqi is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have or may in the future be asserted against Fuqi by virtue of Defendants' misconduct.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relies as follows:

A       Determining that each Defendant breached his fiduciary duty;

B.      Requiring the Defendants to account to the Company for their and others'

35

unlawful profits gained through compensation, bonuses and/or insider trading during the relevant period and establishing a constructive trust for their deposit;

C.     Awarding Fuqi compensatory damages against Defendants in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

D.     Awarding plaintiff costs and disbursements and reasonable attorneys' and experts' fees and expenses; and,

E.     Granting such other and further relief as the Court may deem just and proper.

DATED:     New York, New York
            April 15, 2010

SARRAF GENTILE LLP

Ronen Sarraf
Joseph Gentile
116 John Street, Suite 2310
New York, NY 10038
Tel.:    (212) 868-3610
Fax:    (212) 918-7967

*Attorneys for Plaintiff*

36

Supreme Court Records OnLine Library - page 38 of 38

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2010, a true and correct copy of the Notice To

Adverse Party of Removal to Federal Court with attached Notice of Removal was caused

to be served on counsel of record by Federal Express at the following address as

indicated:

### BY FEDERAL EXPRESS

Ronen Sarraf, Esq.
Joseph Gentile, Esq.
Sarraff Gentile, LLP
116 John Street, Suite 2310
New York, New York 10038

MaryAnn Bucek-Kenny